## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

MARY ELIZABETH SMITH,

     Plaintiff,

v.                                                    Case No. 3:23-cv-628-TJC-PDB

AMERICAN NEIGHBORHOOD
MORTGAGE ACCEPTANCE
COMPANY, LLC d/b/a ANNIEMAC
HOME MORTGAGE,

     Defendant.

_____

### O R D E R

    This case involves an employee suing her former employer, alleging race

discrimination, disability discrimination, hostile work environment, and

retaliation. [1]  Defendant American Neighborhood Mortgage Acceptance

---

[1] Count I alleges disability discrimination and hostile work environment in violation of the Americans with Disabilities Act ("ADA"). Count II alleges retaliation in violation of the ADA. Count III alleges disability discrimination and hostile work environment in violation of the Florida Civil Rights Act ("FCRA"). Count IV alleges disability retaliation in violation of the FCRA. Count V alleges race discrimination and hostile work environment in violation of the FCRA. Count VI alleges race retaliation in violation of the FCRA. Count VII alleges race discrimination and hostile work environment in violation of Title VII. Count VIII alleges race discrimination in violation of 42 U.S.C. § 1981. FCRA race and Section 1981 claims are analyzed using the same framework as Title VII, and FCRA handicap claims use the ADA framework. King v. HCA, 825 F. App'x 733, 736 n.2 (11th Cir. 2020) (FCRA claims); Poer v. Jefferson Cnty. Comm'n, 100 F.4th 1325, 1336 (11th Cir. 2024) (§ 1981 claims); Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255 (11th Cir. 2007) (ADA claims).

Company, LLC d/b/a AnnieMac Home Mortgage's ("AnnieMac") motion for summary judgment has been fully briefed. Docs. 31, 32, 35, 40, and 41.

## I.   BACKGROUND

AnnieMac hired Plaintiff Mary Elizabeth Smith on April 5, 2021, as a mortgage closer for the wholesale division. Doc. 1 ¶ 7; Doc. 31-3 at 24–25. Smith was the first person hired for the wholesale division and in September 2021, she was promoted to team lead. Doc. 31-3 at 24, 66–67.

On Smith's recommendation, AnnieMac hired her ex-husband, Lynn Sermons, as a closer.[2] Id. at 24, 56, 110; Doc. 31-2 at 68. Smith and Sermons had divorced in 2020, but were living together and working on a reconciliation. See Doc. 31-3 at 23, 56. Smith and Sermons, both black, worked remotely from the same location. Id. at 57; see Doc. 1 ¶ 15.

In December 2021, Smith complained to Human Resources that her white supervisor, Elizabeth Pitts, was treating her differently than other employees under Pitts's charge and retaliating against Smith because Smith had complained about Pitts's interactions with Sermons.[3] Doc. 1 ¶¶ 11, 16; see Doc.

---

[2] Sermons was hired in May 2021. Doc. 33-14.

[3] Smith testified Sermons admitted he and Pitts were flirting. Doc. 31-3 at 64. Smith initially complained to her prior supervisor, Virginia Strawley, and was told to contact Human Resources. Id. at 65–68. It is not clear if Smith is claiming Pitts's different treatment and retaliation started after Smith complained to Sermons about his interactions with Pitts or after Smith complained to Strawley. See id. at 78–79. The difference is not material.

31-3 at 63–82. Smith expressed concern about the personal nature of the interactions, not race. See Doc. 31-3 at 64, 68-81; Doc. 31-2 ¶¶ 17–18. AnnieMac's Vice President of Human Resources, Lisa Wypych, investigated the complaint and Pitts was counseled about "sending messages of a personal nature" to her team.[4] Doc. 31-2 ¶¶ 1, 19. Wypych did not find evidence that Pitts treated Smith differently or retaliated against Smith. Id. ¶ 19. Smith testified she did not recall Pitts treating her differently due to race.[5] See Doc. 31-3 at 113.

On January 14, 2022, AnnieMac conducted a layoff due to tough market conditions, which included Pitts. See Doc. 33-14; Doc. 31-3 at 82–83; Doc. 31-2 ¶ 20. After Pitts's layoff, Virginia Strawley and Ed Siler supervised Smith. See Doc. 31-3 at 84. AnnieMac had another layoff in June 2022, which included Strawley. Doc. 31-2 ¶ 22; Doc. 33-14. In the June 2022 layoff, AnnieMac eliminated Smith's team lead position, resulting in Smith being demoted to closer (but still employed), with Siler as her sole supervisor.[6] See Doc. 31-3 at 86–90, 93, 106; Doc. 31-2 ¶¶ 22–23. Smith's title changed, but her base pay did

---

[4] Wypych reviewed messages between Pitts and Sermons, which did not involve race. Doc. 31-2 ¶ 18.

[5] Smith described other work conflicts with Pitts but also testified Pitts rated her performance favorably. See Doc. 31-3 at 78–79.

[6] Smith was the only team lead in the division. See Doc. 32 at 3.

not.[7] Doc. 31-3 at 89; Doc. 31-2 ¶ 24. Siler told Smith there would be a transition period from team lead to closer due to her upcoming vacation, the need for her to continue to assign loans, and because she would need to learn changed processes. Doc. 33-4 ¶ 19; Doc. 31-3 at 94, 105, 137. After the June layoff, Smith and Sermons were the only two black closers for the wholesale division. See Doc. 31-3 at 110.

On Friday, August 19, 2022, Siler gave Smith a verbal warning about her recent poor work performance and recapped the discussion by email later that day. Doc. 31-2 at 65. Siler's email had the subject of "Verbal Warning Recap," was sent only to Smith, and said:

> Hello Liz,
>
> As discussed on Friday 8/5 and again this afternoon, your work productivity has been unacceptable [] recently with respect to both number of loan closings and overtime.
>
> Since our original conversation on Friday 8/5 you have only worked on 6 loans total with 2 loans closed. To accomplish this you have worked 6.55 hours of overtime last week and worked 35.5 hours through this Thursday.
>
> As a reminder, you are not allowed to work overtime without prior approval.
>
> Since no overtime has been approved, you need to clock out today and we will reassign the [current] loan to another closer.

---

[7] Smith stopped getting bonuses. See Doc. 31-3 at 102.

Going forward you should have roughly 10-15 loans assigned [in your pipeline] and be closing no less than 1.5-2 loans per working day depending on the total pipeline size.

Please let me know if you need further assistance or guidance that we can provide you to meet these expectations to ensure you can meet these goals as a Senior Closer.

Please respond to acknowledge receiving this email and let me know if there are any additional details that we spoke about that I missed.

Sincerely,

Ed Siler
[signature block omitted]

Id. Before this, Siler and Smith had not had conversations about her performance, and their interactions had been limited, mainly occurring as part of a weekly team meeting. Doc. 31-3 at 133–35. When she was team lead, Smith did not have issues with Siler. Id. at 67–68, 85–86.

One prior incident with Siler concerned Smith. Several months before her warning, Smith was invited to a call when Siler gave Sermons a written warning about his responsiveness, which Sermons disputed. Doc. 31-3 at 107–14. Smith thought she was included to embarrass Sermons and because she had recommended Sermons. See Doc. 31-3 at 107–10. The call lasted less than five minutes. Doc. 31-3 at 108–09. Smith believes her warning was prompted by a complaint to Siler that Smith was not responding to emails, even though that was not part of the warning itself. See id. at 116–18, Doc. 32 at 11.

Smith disputes the basis for Siler's August 19th warning (including denying a prior performance discussion) and alleges Siler yelled and cursed at her, told her she didn't know what she was doing, moved all the loans out of her pipeline, and told her to get "off his clock" (because she was not approved for overtime).[8] Doc. 31-3 at 116–17, 126–27, 129–30; Doc. 32 at 11; Doc. 33-4 ¶ 21. Smith understood she was still transitioning to the closer role, unlimited overtime was approved, and she did not have a specific goal for number of closings. Doc. 31-3 at 101, 135. Although Siler's demeanor surprised Smith, she was not surprised to have a disputed complaint about responding to emails since that happened to Sermons. Id. at 119–20.

Several hours after Siler's recap email, Smith emailed Siler and others, with the subject "HOW DOES IT FEEL?? BEING BLACK & DEALING WITH BIAS PEOPLE/BIAS SITUATIONS??"[9] Doc. 31-2 at 68–69. The email states:

> Hello Lisa [Wypych],
>
> I hope & pray all is well with you and your family. I tried to reach out to you personally regarding a issue that I had or have no control over! But first I must outline a couple of things with everyone on this email because I'm pretty sure you will never understand because you're skin is not the same color as mine ☹. How does it

---

[8] Siler denied cursing. Doc. 31-2 at 99.

[9] The other recipients included Wypych; Sermons; Terra Rozzell, Wholesale Account Manager; and Michael Royer, a company owner. Doc. 31-2 at 68; Doc. 31-3 at 125; Doc. 31-2 at 70. The formatting and language of the email reflects the original.

feel being a strong, courageous, hard working black woman who has to deal with being belittled because of the color of her skin???

Any answers anyone?? Nahhhh because this is something that you all will never have to go through or deal with (which is so so sad to say)

@Terra Rozzell I would like to thank you so much for trying to explain a situation to a person (@Ed Siler) that should have being reading his emails instead of choosing sides, and pointing fingers! I took the role of a wholesale closer here @ AnnieMac back on 4/5/2021 and was actually the 1st and only closer here working and pushing out closing packages by myself. When business started to grow I then recommended to bring on another closer @Lynn Sermons to the team who excelled quickly after days and nights of me training him & he's still doing a great job. Well done to @Lynn Sermons for all your hard work and dedication as well. Between the both of us we stayed numerous days and nights working to fulfill the AnnieMac dream of meeting & succeeding goals. During my role of being a closer I had more added duties/roles to play. I knew that I was taking on more responsibilities at that time without being given any or asking to be compensated for my work because I have a passion for the work I do and loved working for the so called wonderful company AnnieMac. I say this was a so called company only because people in power can put a bad name and reputation on the company! Especially when they receive a phone call from their manager who belittled them for their wrong doing and actions and because they also know how to downplay a worker over the telephone to hurt them with the words they say! Oh and yes some of these words showed his BIAS actions and ways!!! I was promoted to Closing Team Lead on 9/16/2021 because my manager at that time saw this colored woman's worth and had faith in me on how well I've excelled over those few months. I know I'm sharing my performance with you all but this just shows how well I have done with and for AnnieMac Home Mortgage.

I would like for you all to know how much this is affecting me MENTALLY AND EMOTIONALLY because this isn't the first time that I've dealt with the issue. My last manager Elizabeth Pitts

showed bias to me as well which affected me once again mentally & emotionally! Human Re-sources knows about that situation as well!

Guys this world is changing and people are getting more aggressive by attacking us with their words, actions, power trip & etc. and it's SAD! We must show transparency at times but this is one of those times where once again another black employee has to be finger pointed out for NO REASONING because of them being ==Bias!== I hope and pray that some people wake up and smell the coffee for once because WE (black people) aren't going anywhere!!! We are here in this country and we cry the same tears and bleed the same color.

*I was given a verbal warning today and was told how my performance sucked as a closer here at AnnieMac on a phone call from @Ed Siler Below is a comparison of our current pipeline views for the month. Hmmmmmm do you see too much of a difference? Also take in considerations that I also was out on vacation as well this month!*



WE SHOULD ALL BE ACCOUNTABLE FOR OUR ACTIONS!!! TODAY 8/19/2022 I MARY ELIZABETH SMITH HAD TO DEAL WITH ONE OF THE HARDEST SITUATIONS THAT OUR NATION FACE TODAY BUT I STILL STAND FOR CHANGE AND THIS IS WHY SOME PEOPLE WILL NEVER LET US RISE!! SO IN ORDER TO FEEL MY PAIN ASK YOURSELF A QUESTION......WILL YOU STAND FOR CHANGE WITH ME?

**"I Have a Dream"** – Washington, D.C., August 28, 1963

<u>In his most famous speech, King stood on the steps of the Lincoln Memorial and called for an
end to racism in the United States before a crowd of more than 250,000 people.</u>



[signature block omitted]

<u>Id.</u> Wypych called Smith the next day (Saturday, August 20, 2022). Doc. 31-3 at

129–30. During the call with Wypych, Smith disputed the basis for the warning,

said Siler's behavior on the call was demeaning and belittling, and was making

her anxiety and depression worse. <u>Id.</u> at 130. The call with Wypych was the first

time Smith told AnnieMac of problems with anxiety, depression, or PTSD.[10] <u>Id.</u>

at 112, 140–41; <u>see</u> Doc. 33-4 ¶ 27.

Smith mentioned other issues as well. Smith brought up her prior

complaint about Pitts and asked if Pitts had ever been disciplined. <u>Id.</u> at 131.

Wypych told Smith it was "none of [her] business." <u>Id.</u> Smith told Wypych she

was calling from the hospital, and Wypych understood Smith to be hospitalized

herself. Doc. 31-2 ¶ 28. Smith was actually at the hospital to visit her mother

after surgery. Doc. 31-3 at 131, 144. During the call, Wypych told Smith she

---

[10] Smith had told Strawley of her migraines and Strawley knew Smith
had monthly doctor appointments, but apart from Sermons, Smith had "never
told anyone" at AnnieMac about issues with depression, anxiety or PTSD until
the call with Wypych. Doc. 31-3 at 141.

would be placed on leave, and Smith responded she had short- and long-term disability coverage. Id. at 141–42.

> Q: All right. Now, this issue with -- I guess after -- did you come to an understanding after your conversation with Ms. Wypych on August 20th, you know, what the leave process involved and what you were going to need to do to apply for the leave?
>
> MS. AZOR: Objection. You can answer.
>
> [Smith]: Okay. Lisa Wypych on that Saturday when she called me, she told me that she was placing me -- you know, putting me on leave or whatever. And she didn't explain the process. She said that she'll email me the paperwork, and that was for FMLA. I stated to Lisa Wypych, Hey, I pay for short-term disability and long-term disability through my insurance. And I have accrued almost 300 hours with my vacation time, sick time, and everything. That should be exhausted to me. . . .
>
> Q: When you spoke to Ms. Wypych on August 20th, did you make any statement to her or communicate that you were unsure whether you could perform your job duties at that time?
>
> A: I told her that my disability from the anxiety, my major depression disorder, all of that, it's, like, flared up.
>
> Q: Well –
>
> A: I never told her I can't perform my job.

Doc. 31-3 at 142–43.

According to Wypych, Smith said she planned to apply for disability leave, so Wypych processed paperwork to change Smith's work status from Active to On Leave, including disabling Smith's computer access. Doc. 33-10; Doc. 33-4 ¶ 27; Doc. 33-9 at 31–32. Wypych denied pressuring Smith to take leave, and testified Smith said she was unable to do her job because of the stress and anxiety. Doc. 31-2 ¶¶ 29–33; Doc. 33-9 at 25.

10

Wypych emailed the same day, stating "Liz, please find attached the flyer . . . to request a leave of absence effective 8/22/2022. Let me know if you need further assistance."[11] Doc. 31-2 ¶ 31, at 88. Wypych spoke to Smith on August 23, 2022, and Smith did not indicate she wanted to work.[12] See Doc. 31-2 ¶ 32. Some time in August 2022, Smith applied for disability benefits. See Doc. 31-4 at 2.[13]

Smith tried to login the Monday morning after the call, August 22, 2022, but could not.[14] Doc. 33-4 ¶ 28. At her deposition, Smith testified she was physically able to work at that time and denied requesting leave. Doc. 31-3 at 130–31, 133, 156.

On September 7, 2022, Smith told Wypych (and other AnnieMac personnel) she had not requested leave.[15] Doc. 31-2 ¶ 33, at 95–96. Because

---

[11] The leave paperwork was sent to msermons1, which appears to be a personal email address Smith accessed and used. See Doc. 31-2 at 68–96.

[12] The record does not indicate that Smith responded to the email providing leave paperwork and Smith does not dispute Wypych's version of the call on August 23, 2022.

[13] The record does not contain a copy of the leave or disability application, but after being told benefits were denied on October 24, 2022, Smith objected to the outcome and delay, saying "These forms were already filled out entirely and returned to you back in August by myself and my Doctor's office." Doc. 31-4.

[14] Smith thought she might have been fired on the call. Doc. 31-3 at 130–31.

[15] Wypych's email includes other recipients who appear to be associated with leave or disability benefits because the email addresses do not indicate affiliation with AnnieMac. Smith's response adds Royer, Siler, Ryan Kube, and

Smith had already been out of work more than three days, Wypych required Smith get a doctor's note to confirm her ability to work. Id. ¶ 33; Doc. 33-9 at 30. Smith had leave paperwork completed on September 26, 2022, which indicated she was unable to work, had been "continuously unable to work from 8-22-2022," and had been treated in the ER on August 24, 2022. Doc. 31-4 at 12. In discovery responses, Smith stated that after she objected to leave, she thought she had to apply for leave to keep her job. Doc. 40-2 at 14.

Smith did not disagree with her doctor's assessment.[16] Doc. 31-3 at 143–44.

> Q: Well, I mean, at some point did your doctor, though, sign the paperwork where in his medical opinion you were not able to perform your job duties? Do you recall that?
> A: Yeah.
> Q: Okay. Do you disagree with his findings in that regard?
> A: No. He knew what I was going through. I explained it to him, my psychiatrist.

Id.

The tough market conditions continued, culminating in a layoff of the entire wholesale division on October 31, 2022, which included Sermons and Siler. See Doc. 33-14; Doc. 31-2 ¶ 36. Smith remained employed, on an unpaid

---

Joseph Panebianco, who have email addresses indicating affiliation with AnnieMac. Doc. 31-2 at 94–95.

[16] The leave paperwork was submitted to Mutual of Omaha but not returned to AnnieMac. See 31-2 ¶ 34; Doc. 31 at 13.

leave, until February 28, 2023, when she was terminated. Doc 31-2 ¶ 38. Smith
never heard any racist comments while she was employed at AnnieMac. Doc.
31-3 at 159.

## II.    ANALYSIS

### A.    Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant
summary judgment if the movant shows that there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law."
Further, the Court has construed evidence in the light most favorable to Smith.
See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014).

### B.    Smith's Leave

The overarching issue for Smith's discrimination and retaliation claims
concerns whether Smith was improperly forced into a leave when she was
willing and able to work. Smith testified at her deposition that she did not
request the leave and was able to work when the leave started. Wypych testified
Smith said she could not work and planned to request leave. In their briefs,
Smith's argument focuses on whether she requested leave, while AnnieMac also
addresses whether Smith was able to work.

After the warning to Smith, there is little dispute about what happened
and what did not happen, except for the disagreement about whether Smith

requested leave.[17]  The tone of Smith's email response is very different from the email sent to her, prompting Wypych to reach out the next morning, Saturday.[18]

On the Saturday call, Smith told Wypych Siler's warning exacerbated her depression, anxiety, PTSD, and she had been to the hospital.[19] When Wypych suggests a leave, Smith brings up that she pays for short- and long-term disability coverage and has vacation and other paid time off she can use. Based on the call, Wypych understands Smith wants to be on leave and acts accordingly—by processing a status change, disabling Smith's computer access, and forwarding the leave paperwork for Smith to complete. There is no evidence Smith told Wypych at that time (either during their Saturday conversation or by responding to the Saturday email), she did not want leave or objected to leave.

Smith tried to login Monday morning but could not. There is no evidence Smith attempted to contact anyone at AnnieMac that day to determine why she could not login or to request access be restored. On Tuesday, Wypych and Smith

---

[17] As discussed infra, Smith disputes whether the warning was valid. Even so, the expectations for a closer are not in dispute, only whether Smith had been told those expectations applied to her, and this dispute is not material.

[18] Smith argues the fact that Wypych called on Saturday is evidence AnnieMac "rushed to keep [her] from returning to the office" because "there was no urgency." Doc. 32 at 11.

[19] It is undisputed Smith told Wypych she had been to the hospital, even though Wypych misunderstood the reason.

talked again and Smith did not object to the leave or request to return to work.[20] On Wednesday, August 24, 2022, Smith is treated at the emergency room. Sometime during August, Smith applied for disability benefits.

After Smith is out of work for two and a half weeks, Wypych communicated again about leave benefits. Smith's response includes other AnnieMac personnel and states she was forced to take leave even though it had never been requested. Wypych responds within a few hours, telling Smith she can return to work by getting a note from her doctor. There is no dispute Smith did not meet this requirement. On September 26, 2022, Smith's doctor completed leave paperwork indicating Smith had been "continuously unable to work from 8-22-2022," which was the Monday after the Saturday phone call between Smith and Wypych. Smith testified she did not disagree with her doctor's opinion that she was unable to work.

Even with a fact dispute about whether Smith requested leave, it is Smith's willingness and ability to work that is the material issue. AnnieMac has produced evidence to show that as of the time of the August 20, 2022, phone call between Smith and Wypych, Smith was unable to work. Smith has not met her burden to produce enough evidence to allow a reasonable fact finder to conclude she was able and willing to work after the Wypych phone call. See

---

[20] Smith did not testify about this call or what occurred.

Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) ("A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could reasonably find for that party.") (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)). Although evidence is construed in the light most favorable to Smith, Smith must still "produce sufficient evidence to allow a reasonable finder of fact to the conclude that the [employer's] reasons were not believable." Brooks, 446 F.3d at 1163 (citing Jackson v. Ala. State Tenure Comm'n, 405 F3d. 1276, 1289 (11th Cir. 2005)). This she has not done.

## C. Disability Discrimination and Hostile Work Environment - Count I (ADA) and Count III (FCRA)

To establish discrimination under the ADA, a plaintiff must show: (1) she was disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability. Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255–56 (citation omitted). The ADA has three definitions of a disability: (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). If a prima facie case is established, the burden-shifting analysis of Title VII applies. Holly, 492 F.3d at 1255–56.

"If the plaintiff makes out a prima facie case, the burden then shifts to

16

the defendant to articulate a legitimate reason for the adverse action. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1297 (11th Cir. 2006) (internal citation omitted). To establish pretext, the plaintiff must show "the proffered reason was not the true reason for the employment decision . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Jackson</u>, 405 F.3d at 1289 (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)). The evidence for pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." <u>Vessels v. Atlanta Indep. Sch. Sys.</u>, 408 F.3d 763, 771 (11th Cir. 2005) (cleaned up).

Count I of Smith's Complaint includes three legal theories: discrimination based on being disabled, discrimination based on being regarded as disabled, and a hostile work environment based on disability.[21] Doc. 1 ¶¶ 44, 47–48.

---

[21] Apart from different statutory references, Counts I and III are similar and it is not necessary to separately discuss them.

### 1.    Regarded As Discrimination Claim

The alleged involuntary leave[22] satisfies the first and third prong of a prima facie case because it was an adverse employment action and allows a fact finder to conclude Smith was regarded as disabled. AnnieMac disputes the second prong, arguing Smith was not qualified because she was unable to work. Doc. 35 at 5. There is no dispute Smith was qualified and able to be a closer, at least up until the warning. For the reasons discussed at pp. 13-16 supra, Smith has not established she was qualified to work when the leave started and therefore has not established a prima facie case.[23]

Even if Smith had established a prima facie case, her claim still fails because she cannot establish pretext.[24] AnnieMac placed Smith on leave after Smith responded very emotionally to a performance warning, and disclosed the warning worsened her problems with depression, anxiety, and PTSD. Smith

---

[22] As the Court has discussed supra, there is a dispute about whether the leave was voluntary, but if construed as involuntary, it could be an adverse employment action if Smith had been able to work.

[23] Smith testified the alleged involuntary leave worsened her depression and anxiety, impliedly arguing that she was able to work when the leave started, but the unpaid leave added more stress, ultimately preventing her from working. Doc. 32 at 4; see Doc. 31-3 at 143.

[24] Smith's argument that reasons for her termination are pretextual is really about the reasons for her leave. See Doc. 32 at 16–17. Smith argues that AnnieMac's investigation into her complaint about Siler was inadequate because it did not include Sermons, but this is not material to any claim and does not show the reason for leave was pretextual. See id. at 17.

testified Wypych told Smith she was placing Smith on leave and sent leave paperwork that day. Smith's disclosure that the warning worsened her condition was a legitimate basis for AnnieMac to initiate her leave.

Thus, AnnieMac had a legitimate business reason to put Smith on leave. Smith first objected to being on leave after being out of work for more than two weeks. During that time, Wypych called Smith at least once more, Smith was treated in the ER, and Smith applied for disability. After she objected to the leave, Smith did not return to work because she did not provide the requested doctor's note. Smith's doctor completed the FMLA paperwork on September 26, 2022, indicating she was unable to work and had been unable to work since August 22, 2022, the first workday after her Saturday phone call with Wypych. And even though she eventually objected to the leave, that objection is not sufficient to allow a fact finder to conclude that AnnieMac's reason for placing her on leave was a pretext for a discriminatory reason.

Accordingly, summary judgment is due to be granted as to Smith's disability discrimination claim based on being regarded as disabled.

## 2.    Disability Discrimination Claim

Smith does not have a prima facie case of discrimination based on being disabled because she has not established she had a physical or mental impairment that substantially limited a major life activity. In opposing

summary judgment, Smith has a conclusory statement, that after informing Wypych of her disability, she was forced to take leave. Doc. 32 at 16.

But there is no dispute Smith told Wypych she had PTSD, and the interaction with Siler had worsened issues with anxiety and depression. Smith described various aspects of her treatment (medication and appointments) but does not provide information about how PTSD (or any other impairment) substantially limited her in a major life activity. See Doc. 32 at 3; Doc. 31-3 at 48–50. The record does not indicate Smith ever needed or requested an accommodation to do her job and she has not made a failure to accommodate claim. To the contrary, Smith's objection to the leave is her claim she was able to work.

Smith's other support for her disability discrimination claim is that after she told Wypych she had not requested leave, Wypych required a doctor's note for Smith to return to work. AnnieMac contends requiring the doctor's note was consistent with company policy since Smith had been out of work for more than three days. Smith argues she was only out of work because of Wypych's improper action to put her on an involuntary leave. This is not material to any disability claim. There is no evidence Smith was able to work when Wypych required the doctor's note; indeed, the doctor's medical note is to the contrary and Smith testified she did not disagree with the doctor.

20

Accordingly, Smith has not established a prima facie case of discrimination based on being disabled and summary judgment is due to be granted.

### 3.    Hostile Work Environment based on Disability

To establish a claim for a hostile work environment, Smith must prove (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on the protected class, (4) the harassment was severe or pervasive enough to alter the terms and conditions of her employment, and (5) the employer was vicariously or directly responsible for the environment. Gooden v. Internal Revenue Serv., 679 F. App'x 958, 966 (11th Cir. 2017) (citing Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012)).[25] Only conduct that is based on a protected category, such as disability or race, may be considered in a hostile work environment analysis. Jones, 683 F.3d at 1297. Behavior that is merely unfair or rude, but not tied to a protected characteristic, does not support a hostile work environment claim. Hunsaker v. Found. Partners Grp. LLC, Case No. 6:18-cv-1996, 2020 WL 10355118, at *11 (11th Cir. Dec. 23, 2020) (citing Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs., 47 F.3d 1068, 1074 (11th Cir. 1995)).

---

[25] The Court does not rely on unpublished opinions as binding precedent, however, they may be cited when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022).

As it relates to disability, Smith's claim of a hostile work environment is based on the leave and its circumstances. Smith alleges Wypych's tone during the Saturday conversation was demeaning and condescending and that Wypych misconstrued the conversation.[26] A prima facie case for discrimination requires an adverse employment action (related to a protected characteristic) while a hostile work environment requires harassment (based on a protected characteristic) so pervasive or severe that it alters terms and conditions of employment. "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115–16 (2002) (describing an abusive working environment as "discriminatory intimidation, ridicule, and insult" that is "sufficient to alter terms and conditions of employment").[27]

---

[26] Smith's complaint combines her discrimination and hostile work environment stating those claims are based on Wypcyh's:

> demeaning and condescending manner toward Plaintiff, misconstruing conversations with Plaintiff in order to create the impression that Plaintiff requested a leave of absence, revoking Plaintiff's access to Defendant's systems such that she was not able to report to work, placing Plaintiff's on involuntary unpaid leave despite Plaintiff's repeated objections, requiring Plaintiff to remain on involuntary unpaid leave and requiring that she applied for FMLA leave and short term disability in order to preserve her job, treating Plaintiff differently than non-disabled employees and terminating Plaintiff.

Doc. 1 ¶ 49.

[27] In circumstances not present here, a discrete act can be sufficient to

As a matter of law, the single incident cited by Smith is insufficient to support a hostile work environment claim. Moreover, Smith's opposition to summary judgment only argues her hostile work environment claim is based on treatment from her supervisor Siler (not her interactions with Wypych) and is related to race (not disability). See Doc. 32 at 2, 6, and 17.

Accordingly, summary judgment is due to be granted as to Smith's hostile work environment claim based on disability.

## D.    Disability Retaliation - Count II (ADA) and Count IV (FCRA)

A prima facie case of ADA retaliation requires (1) statutorily protected activity,[28] (2) a materially adverse action, and (3) a causal connection between the two. Batson v. Salvation Army, 897 F.3d 1320, 1329 (11th Cir. 2018). Smith has not established a prima facie case because she has not demonstrated protected activity under the ADA.

Count II of Smith's complaint claims her ADA protected activity was "complain[ing] of AnnieMac's discriminatory conduct," but does not further explain or provide detail. Doc. 1 ¶ 56. Smith's email about Siler complains of

---

support a hostile work environment claim.

[28] The prima facie case for retaliation under Title VII and the ADA is the same, but protected activity must relate to the applicable statute. See Adamson v. City of Birmingham, Ala., No. 24-11201, 2024 WL 5088414 (11th Cir. Dec. 12, 2024) (identifying filing an EEOC charge as protected activity for Title VII retaliation claim and request for accommodation as protected activity for ADA retaliation claim).

race bias and is protected activity for her FCRA retaliation claim, but is not protected activity under the ADA. When she sent the email, Smith had not told anyone at AnnieMac about her PTSD, anxiety and depression. That occurred the next day on the call with Wypych.

Construing the record in the light most favorable for Smith, her communication on September 7, 2022, saying she was "forced into a leave of absence on Saturday morning 8/20/2022," might be protected activity, but Smith still lacks a prima facie case. Courts have held an adverse action before protected activity is not causally connected as a matter of law. Debe v. State Farm Auto. Mut. Ins. Co., 860 F. App'x 637, 641 (11th Cir. 2021) ("[I]f the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected."). If the September email is construed as protected activity, it was after the adverse action of placing her on leave in August and therefore not causally connected. Finally, Smith's opposition to summary judgment mentions her complaint of race discrimination as protected activity and does not specify what was protected activity related to her disability retaliation claims.

Accordingly, summary judgment is due to be granted as to Smith's retaliation claims based on disability.

**E.    Race Discrimination and Hostile Work Environment - Count V (FCRA), Count VII (Title VII), and Count VIII (Discrimination only under Section 1981)[29]**

Smith does not allege direct evidence of race discrimination, and claims based on circumstantial evidence are generally analyzed under the McDonnell Douglas burden-shifting framework.[30] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). If a plaintiff establishes a prima facie case, the employer may rebut it with a legitimate reason for the adverse action, and then the plaintiff must show the proffered reason is pretextual. Jackson, 405 F.3d at 1289.

**1.    Race Discrimination Claim**

To establish a prima facie case of race discrimination, Smith must show: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly situated individual outside her protected class. Maynard v. Bd. of Regents, 342

---

[29] Similar to Counts I and III, Counts V and VII include disparate treatment and hostile work environment claims. Apart from different statutory references, the claims are similar and do not need to be separately discussed.

[30] The Court is mindful the McDonnell Douglas paradigm is an evidentiary framework that does not change the ultimate question of whether there is enough evidence to establish illegal discrimination. Tynes v. Fla. Dept. of Juv. Just., 88 F.4th 939, 941 (11th Cir. 2023). Summary judgment is not proper so long as a plaintiff presents a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. at 946 (cleaned up).

F.3d 1281, 1289 (11th Cir. 2003) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802). To satisfy the fourth element, the alleged comparator must be "similarly situated in all material respects." <u>Lewis v. City of Union City</u>, 918 F.3d 1213, 1224 (11th Cir. 2019). A similarly situated comparator will ordinarily have (1) engaged in the same behavior; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history. <u>Id.</u> at 1227-28.

Smith's evidence of race discrimination includes allegations about how she was treated differently and allegations of improper treatment towards other black employees (disproportionately laid off and loan reassignments). Because Smith has plead disparate treatment and not disparate impact, her claim blacks were disproportionally laid off is not relevant.[31] Doc. 33-4 ¶¶ 8-9; Doc. 31-1 at 155. Apart from Smith's testimony that loans were reassigned, there is no evidence about how often it occurred or under what circumstances.[32] The only

---

[31] Claiming blacks were disproportionately terminated describes a disparate impact claim. A disparate impact claim is substantively different than a disparate treatment claim. <u>See</u> <u>Lee v. Geo Secure Servs., LLC</u>, No. 22-cv-60689, 2022 WL 17740272, at *4–5 (S.D. Fla. Nov. 16, 2022), (discussing differences between disparate treatment and disparate impact), <u>report and recommendation adopted</u>, 2022 WL 17736219 (S.D. Fla. Dec. 16, 2022). Nor is the record sufficiently developed to support such a conclusion. For instance, demographic data is limited and there is not information about layoff criteria. Smith alleges she and Sermons were the only blacks on the team at "all relevant times," and testified she and Sermons were the only blacks left. <u>Compare</u> Doc. 1 ¶ 15, <u>with</u> Doc. 31-3 at 92.

[32] Smith alleges Pitts directed her to take loans from black closers and

26

support that loan reassignments were race related is Smith's speculation. Because these loan assignments were not to or from Smith, they were not an adverse employment action she suffered.

Smith's allegation of improper treatment included her demotion from team lead to closer, the performance warning from Siler (including Siler's belittling behavior of yelling and cursing at her), and her leave.[33] Doc. 32 at 2, Doc. 32 at 11. Although Smith disputes the basis for the warning, this is nothing more than a disagreement with the business judgment of her employer, as to her role and its expectations. Performance feedback and discipline are within the discretion of the employer. See Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (noting the Court will "not sit as a super-personnel department that reexamines an entity's business decisions."). Smith "is not allowed to recast [AnnieMac's] proffered nondiscriminatory reasons or substitute [her] business judgment for that of [AnnieMac]." Chapman, 229 F.3d at 1030. Thus, disputing

---

reassign them to white closers, and she thought Siler took loans from Sermons and reassigned them to prevent Sermons from being the top closer. Doc. 33-4 ¶¶ 8–9; Doc. 31-3 at 155. Incentive pay was based on the number of closings, so loan assignment could impact compensation. See Doc. 33-4 ¶ 10; Doc. 31-3 at 100.

[33] Smith complained Siler reassigned all of her loans, but this only occurred after the leave. Doc. 40-2 at 9. Siler did reassign one of Smith's loans on August 19, 2022. Doc. 31-2 at 65. Siler had not reassigned any of her loans previously. Doc. 31-3 at 128–29.

the basis for the warning is not a material fact dispute. Id. A demotion and involuntary leave, however, are adverse employment actions.

Smith can establish the first three prongs of a prima facie case, but not the fourth. Smith belongs to a protected class, was qualified for her position and the demotion and alleged involuntary leave are adverse employment actions. It is undisputed Smith's team lead position was eliminated as part of the workforce reduction in June 2022, but she has not provided evidence about being replaced or that any similarly situated comparator outside her protected class was treated differently, much less that the business reason was pretextual. It is undisputed the wholesale division was struggling in 2022, with at least two layoffs earlier that year before closing entirely. There is no evidence she was replaced or treated differently than a comparator. Nor is there a convincing mosaic of evidence to show she was treated differently due to race.[34]

Accordingly, summary judgment is due to be granted as to Smith's race discrimination claims under Title VII, FCRA, and Section 1981.

_____

[34] AnnieMac has argued that portions of Smith's evidence should be disregarded. See Docs. 35, 37, 41. The Court has addressed why Smith's claims about improper treatment of others is not material. See note 31 supra. The Court does not find it necessary to separately rule on any other evidentiary issue raised.

### 2.    Hostile Work Environment based on Race

To establish a hostile work environment claim based on race, Smith must prove (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment based on race, (3) the harassment was severe or pervasive enough to alter the terms and conditions of her employment, (4) and the employer is responsible. Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1248-49 (11th Cir. 2014). As discussed supra, to support a hostile work environment the conduct must be based on a protected characteristic and involve more than behavior that is merely unfair or rude.

Smith's hostile work environment claim is based on Siler's recap email, the meeting earlier that day with Siler to discuss performance, and Siler's alleged demeaning and belittling behavior in the meeting. Although Smith argues Siler's behavior towards her was "constant[ly] demeaning," she does not identify any incidents other than the day of the warning, except for being invited to a five-minute call, months earlier, when Siler issued Sermons a warning. Smith testified her interactions with Siler were infrequent, usually just the weekly group meeting. Compare Doc. 32 at 2, with Doc. 31-3 at 134–35. Siler had not given Smith any performance feedback before the warning. Doc. 31-3 at 133–34. As a matter of law, these incidents are neither severe nor pervasive. Moreover, while Smith and Sermons are both black, there is no other

connection to race before or during the warning, other than Smith's reaction to it.

Accordingly, summary judgment is due to be granted as to Smith's claim for a hostile work environment due to race.

### F.    Retaliation - Count VI (FCRA)[35]

A prima facie case of retaliation requires (1) protected activity, (2) a materially adverse action, and (3) a causal connection between the two. Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir. 2013). Retaliation claims based on circumstantial evidence also use the McDonnell Douglas burden-shifting paradigm. Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020). And retaliation applies a "but-for" causation standard. Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1135 (11th Cir. 2020) (citing Univ. of Tx. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)).

Protected activity has a subjective and objective component. Little v. United Tech., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). AnnieMac argues Smith cannot establish a prima facie case because her "immediate and unwarranted assumption . . . that Siler's conversation regarding her performance . . . arose from racial animus as opposed to Plaintiff's woeful lack of productivity was completely unreasonable and without objective

---

[35] Smith does not make a claim for retaliation under Title VII, only the FCRA. Even so, the same analysis is used.

support." Doc. 31 at 17–18.

AnnieMac's characterization overlooks how facts might and must be viewed in Smith's favor at this stage. If only the emails were at issue, the difference in tone of Smith's response to the warning recap email might be deemed unreasonable. But, viewing the facts in the light most favorable to Smith, she is also responding to Siler's tone and demeanor from their earlier meeting. Smith testified Siler yelled, cursed at her, and belittled her. Siler chastised her for working overtime and not closing enough loans, while she testified overtime was approved and she did not have a loan quota. Plus, she and Sermons had allegedly both been disciplined after unfounded complaints about lack of responsiveness. If Smith's version is credited, her email is not objectively unreasonable and the Court finds she has established she engaged in protected activity, meeting the first prong.

AnnieMac argues her leave and eventual termination were not adverse actions causally connected to protected activity. AnnieMac argues Smith's termination is not causally connected to any protected activity because the whole division was closed. The Court agrees that Smith's termination is not causally connected to any protected activity.

AnnieMac argues the leave was not an adverse action because Smith requested it. This argument fails because Smith disputes requesting the leave. When an adverse employment action occurs shortly after protected activity, the

closeness in time may support a causal connection. <u>Grant v. Miami-Dade Cnty. Water & Sewer Dep't</u>, 636 F. App'x 462, 468-69 (11th Cir. 2015) (citing <u>Higdon v. Jackson</u>, 393 F.3d 1211, 1220 (11th Cir. 2004)). Smith complained of race discrimination one day and was placed on leave the next day, even though she did not specifically request or apply for the leave. While the temporal proximity appears to support a causal connection, that is only true when those two events are viewed in isolation. The leave, however, did not occur solely in response to Smith's race complaint. The evidence, even viewed in the light most favorable to Smith, does not support the conclusion that Smith's leave was because she complained, but for reasons already stated, the leave was because AnnieMac understood Smith could not work.

Even if Smith had a prima facie case of retaliation, she has not provided evidence to show AnnieMac's reason for putting her on leave was pretextual. Nor has Smith created an issue of fact concerning whether "but-for" her complaint the leave would not have occurred.

Accordingly, summary judgment is due to be granted for Smith's retaliation claim based on race.

**ORDERED:**

1.    Defendant American Neighborhood Mortgage Acceptance Company LLC d/b/a AnnieMac Home Mortgage's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56, Doc. 31, is **GRANTED.**

2.    The Clerk is directed to enter judgment in favor of American Neighborhood Mortgage Acceptance Company LLC d/b/a AnnieMac Home Mortgage and against Mary Elizabeth Smith and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, the 30th day of March, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

ddw
Copies:

Counsel of record